IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 22, 2018 Session

## COMCAST HOLDINGS CORPORATION, ET AL. V. TENNESSEE DEPARTMENT OF REVENUE, ET AL.

Appeal from the Chancery Court for Davidson County
No. 12-1749-1     Claudia Bonnyman, Chancellor

No. M2017-02250-COA-R3-CV

This action involves a multistate taxpayer suit concerning an assessment against four Comcast entities doing business in Tennessee for the payment of additional franchise and excise tax liabilities for cable television and internet receipts from Tennessee subscribers. Comcast filed suit against the Tennessee Department of Revenue, alleging that the assessments improperly attributed the cost of performance of various earnings producing activities to Tennessee. Following a hearing, the trial court determined that Comcast failed to correctly identify its earnings producing activity, thereby requiring judgment for the Department. The court alternatively ruled that the activities underlying the licensing costs for video content took place in Tennessee, supporting the assessment for cable television receipts. The court entered judgment against Comcast. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Jeffrey A. Friedman and Daniel H. Schlueter, Washington, D.C.; Maria M. Todorova, Atlanta, Georgia; and Brett R. Carter, Nashville, Tennessee, for the appellants, Comcast Holdings Corporation, Comcast of the South, Inc., and Comcast of Arkansas/Florida/Louisiana/Minnesota/Mississippi/Tennessee, Inc.

Herbert H. Slatery, III, Attorney General and Reporter; Andree S. Blumstein, Solicitor General; and Jonathan N. Wike, Senior Counsel, for the appellee, Tennessee Department of Revenue.

# OPINION

## I. BACKGROUND

Comcast is headquartered in Philadelphia, Pennsylvania, the base for approximately 7,000 employees and where significant business activities take place, including technology and network operations, marketing, content acquisition, procurement of major assets, and accounting and tax. The Comcast entities in this case, which will be referred to collectively as "Comcast," provided internet, cable television, and phone service to customers in Tennessee and 26 other states throughout 2007 and 2008. Comcast timely filed original and amended Tennessee franchise and excise tax returns for all three years at issue, 2006, 2007, and 2008.[1]

Tennessee imposes an excise tax and franchise tax on companies doing business in Tennessee – the excise tax is a percentage of the company's net earnings, while the franchise tax is a percentage of the company's net worth. The Uniform Division of Income for Tax Purposes Act provides a formula for apportioning a multistate taxpayer's earnings and net worth. Comcast explained,

> [T]he amount apportioned to Tennessee is determined by applying a fraction to the taxpayer's total earnings and net worth. This fraction, which is commonly called the "apportionment ratio," is the average of three other fractions –the property factor, the payroll factor, and the receipts factor (the latter of which is double weighted). The numerator of each of these factors is the taxpayer's in-state property, payroll, or receipts.[2]

Each factor in the equation is a separate fraction. The sales receipts factor is calculated by using the taxpayer's Tennessee sales as the numerator and the taxpayer's overall sales as the denominator. The statutes and regulations pertinent to the tax years at issue here specified a method for determining Tennessee receipts. This method was referred to as the "earnings producing activity" or "costs of performance" method, which attributes sales to this state if the earning producing activity which gave rise to the receipt is (1) performed wholly within this state or (2) if a greater proportion of the earnings producing activity is performed in this state when the activity is performed within and without this state. Here, Comcast believed that it was not required to remit franchise and excise taxes on receipts or sales from its internet and cable television service because it performed a greater proportion of these activities outside of Tennessee.

---

[1] The trial court presented a thorough and accurate account of the background and issues presented in this case. Accordingly, we rely heavily upon the court's memorandum opinion in issuing our opinion.

[2] The denominator is four.

In 2010, the Tennessee Department of Revenue ("the Department") began an audit of the returns presented and determined otherwise, finding that Comcast's cable television and internet receipts from Tennessee subscribers should also be treated as Tennessee receipts pursuant to the "destination rule." The Department made adjustments accordingly, resulting in an additional total assessment of $18,571,943.92, including interest. The Department issued notices of assessments to Comcast in September 2012, while a fourth entity was issued a refund of $1,875 in October 2012.

Comcast timely challenged the assessments by filing suit against the Tennessee Department of Revenue on December 14, 2012, raising four issues in support of its challenge. The Department filed a counter-complaint for the amount of the additional tax assessed and sought partial summary judgment, claiming that the earnings producing activities took place entirely and exclusively in Tennessee because that is the state where the services were ultimately delivered to its Tennessee customers. The court denied the motion, holding that the position had been rejected by this court in *Bellsouth Advertising & Publishing Corporation v. Chumley*, 308 S.W.3d 350 (Tenn. Ct. App. 2009), where this court held that the taxpayer's earnings producing activity is not limited to where the service was delivered but instead encompasses a "series of integrated, interdependent steps" necessary to deliver the service.

The case progressed through discovery and further litigation. All but one issue was resolved prior to trial, namely whether the Department's assessment correctly determined Comcast's net earnings and net worth for franchise and excise tax purposes by attributing the cost of performance of various earnings producing activities to Tennessee, a claim with an agreed upon value in excess of $3 million.

At trial, Comcast's employees described, in detail, the activities performed to deliver Comcast's services. A detailed cost analysis was also introduced in which Comcast separately analyzed the costs of its three principal services, (1) internet, (2) cable television, and (3), telephone, as well as two additional categories – (4) rental of customer premises equipment and (5) an "other" category consisting primarily of franchise fees paid to local franchising authorities. Comcast asserted that its detailed analysis established that its costs of activities were higher in Pennsylvania than in Tennessee for its internet and cable television services, while its telephone service, equipment rental, and "other" costs were higher in Tennessee, thereby supporting its tax reporting and rebutting the assessment for the payment of additional tax.

The categories at issue and background facts necessary to understand such categories were summarized in detail by the learned trial court as follows:

Comcast is a multistate provider of cable television, high-speed data (HSD) internet access, and Voice over Internet Protocol (VoIP) telephone services to customers within and outside of Tennessee. Comcast provides these three services to customers in Tennessee using facilities located in Tennessee and throughout the United States. Customers can choose to buy these services individually or as a bundled package of services.

Comcast's company headquarters is located in Philadelphia, Pennsylvania. Approximately 7,000 employees are based in the Philadelphia area. Comcast describes the business activity that takes place at its Philadelphia headquarters to include technology and network operations, marketing, content acquisition, procurement of major assets and back-office functions such as accounting and tax work.

Outside of Philadelphia, Comcast organized its field operations into five divisions based on geography. Tennessee fell into its Southern Division, headquartered in Atlanta. Divisions were described as being responsible for the local aspects of certain activities, such as technical operations, sales and marketing, and customer service.

Comcast has a vast communication network spread throughout the United States consisting of millions of pieces of physical assets, including items such as cable, fiber, lasers, routers, switches, servers, storage arrays and connectors. This equipment, collectively the "network," is necessary to deliver Comcast's three primary services, video, internet access, and telephone, to its customers both in Tennessee and elsewhere.

Comcast owns and operates two Network Operations Centers, one in New Jersey and one in Colorado. These Centers monitor and maintain Comcast's nation-wide network infrastructure necessary to provide all three of Comcast's services. The Centers themselves contain large volumes of equipment and operate 24/7.

Video Services
As to video services, Comcast receives at its Comcast [M]edia Center (CMC) in Colorado the majority of its video content from video content providers in a raw video format. From here Comcast does some technical processing and then distributes the video content throughout the United States over its network. The video content reaches Comcast's customers by being transmitted from the CMC over Comcast's national fiber "backbone" to several divisions within the national network known as converged

- 4 -

regional area networks (CRANs). From the CRANs, the content passes through headends, or small facilities with fiber passing in and out. From the headeands the video traverses the last portion of the network, termed the local cable plant, directly to the customer's house.

During the time at issue, the CRAN serving Tennessee was located in Atlanta and was jointly operated by [an] engineering team in Atlanta and operations team in Colorado and New Jersey. Comcast has multiple headends in Tennessee. A headened receives both the national signals originating from the CMC and local broadcast content. The local cable plant serving Tennessee is also physically located in Tennessee. All available channels have the ability to reach the customer over the "last mile" of the network, including the cable leading directly into a customer's house.

In order to receive Comcast's video service, a customer must acquire and install, or have installed, a set-top box or related equipment. Finally, Comcast must conduct authentication and provisioning activities that will send a signal to the set-top box to decrypt the video content and services for each individual customer based upon the plan they have purchased.

Integral to Comcast's video services is the local cable plant or the local cable system. Comcast conducts its business through affiliates that own and operate local cable systems. Each local cable system covers a particular geographic area. Comcast of the South and Comcast of Arkansas own local cable systems that serve Tennessee subscribers and hold franchise agreements with local government entities that allow them to distribute video content licensed to Comcast. These franchise agreements are required by federal law and the rights to broadcast granted by the agreements are limited to a particular geographic area. Comcast pays a franchise fee to local government entities based upon a percentage of its gross revenues. Comcast did not allocate its franchise fees as a cost of providing video services in Tennessee. Rather, it treated its franchise fee as a "pass-through" item charged directly to its customers and therefore did not consider the fee at all.

Comcast had multiple witnesses testify to the activities Comcast performs to provide video services. Comcast divided its process into nine steps: 1) develop products and technology, 2) negotiate and acquire video content, 3) design and assemble video packages and tiers, 4) receive and process video content, 5) distribute video signals over the national network, 6) install a

customer's premises, 7) authenticate and provision customers via the billing system, 8) descramble video signals at set-top box, and 9) provide customer service.

Programming

Comcast must acquire the programming and other video content it intends to provide through its video service. Comcast acquires most of the video content it broadcasts through licensing the content from the content providers (programmers) that create the content, such as Disney, HBO and other video content providers. Accordingly, its primary business model for video services is entering into licensing agreements with third-party programming providers and then distributing the video content through the local cable systems it owns.

Comcast offers about 350 different channels of video content, and has approximately 500 different programming agreements that govern this content. The programming agreements are not standardized; each agreement is somewhat different. However, in each agreement Comcast generally is required to pay a programming license fee in exchange for the right to distribute the programming provider's video content. Most of the agreements are between five and ten years in duration.

Programming fee rates vary among the many hundreds of agreements. Some programming fees are flat-fees while others are calculated on a per-subscriber basis. Flat-fee arrangements often require Comcast to pay a flat fee for a specific time period, often annually or monthly. Flat-fee arrangements are typical of premium networks like Showtime and HBO, and not as typical with advertising-supported content providers. Some agreements require no payment by Comcast to the content provider, for example, a new network interested in being on Comcast's network. However, the vast majority of the agreements require Comcast to pay a fee based upon the number of subscribers. Under this type of agreement, Comcast is typically charged a fractional dollar amount for every subscriber who receives the licensed product.

The Comcast programming agreements often address the local cable system. Some agreements list the local cable systems covered by the agreement. The agreements often contain buy-and-sell provisions that allow Comcast to add newly acquired cable systems or sell off systems without the need to renegotiate the programming agreement. As for payment, Comcast makes a lump sum payment to the programming content

provider but then charges its cable system subsidiaries for their respective share of the programming cost.

Comcast's programming agreements are negotiated at the corporate headquarters in Philadelphia, Pennsylvania. Comcast states that it benefits from economies of scale by negotiating all programming agreements on a national basis at its headquarters. Such negotiations are conducted by the Content Acquisition Department, a group of 25 to 30 people, seven or eight of which do the actual negotiations. Negotiations can take months as significant terms such as fee structures, renewal, packaging, duration and grant of rights are negotiated. In addition to the actual negotiation of the program agreements, the Content Acquisition Team also determines which content to acquire, creates video packages based on rights negotiated, and issues payments for the rights, all while physically located in Pennsylvania.

Comcast's programming costs are its single largest cost.

HSD Services
As to intent access, Comcast uses its same national network to distribute its HSD services as it uses for its video services. When a Comcast customer in Tennessee attempts to access a website from his or her computer, the customer's request is sent out as data from the customer's cable modem through the local cable plant and then to the national network backbone. Comcast then distributes the data signal to edge routers, which are locations throughout the United States where Comcast's backbone interconnects with the Internet. In the years at issue, Comcast had ten edge router connection points, none in Tennessee. The closest edge router connection points were in Atlanta and Chicago. Thus, Tennessee customers could not access the public Internet without their data signals leaving Tennessee. Once a Comcast customer's outbound request exits Comcast's network, it travels on networks maintained by other providers.

In like fashion, an inbound response from a third party website travels on non-Comcast networks to an edge router, then enters Comcast's backbone network, travels through the local cable system in Tennessee, and ultimately arrives at the Tennessee customer's computer. The routing often takes different paths inbound [versus] outbound because other network providers control the return path. The path chosen is often the quickest path from the sending website, which may not be the Atlanta or Chicago edge router. As such, Comcast uses its entire national backbone network when routing HSD service to its Tennessee Customers. Additionally, as

- 7 -

with its video service, customer support service calls are routed to call centers located throughout the United States.

Comcast had multiple witnesses testify to the activities it performs to provide HSD internet access service. Comcast divided the process into seven steps: 1) develop products and technology, 2) design and assemble tiers, 3) authenticate and provision customers via billing system, 4) transmit data signals to Backbone over the Local Cable Plant, 5) distribute data signals over Backbone to edge routers, 6) hand off data signals to public internet, and 7) provide customer service.

* * *

Cost Studies

Comcast prepared two cost-comparison studies based upon data taken from its general ledgers. Both studies break down by account each of the five categories Comcast has chosen as its "items of income": video, internet access or HSD, telephone, "other", and customer premises equipment. Comcast divided its receipts into these five categories because they correlate to its national marketing model. Comcast customer bills itemize charges for these same five categories.

The conclusion of both studies was that for each year at issue, at least one state had a greater cost of performance than Tennessee for the items of income/earnings-producing categories of video and internet (HSD) services. As to the other three categories, the greatest proportion of direct costs was found to have been performed in Tennessee. At trial, Comcast relied exclusively on the second study, as does this Court.

Comcast's stated . . . purpose of its cost study was to determine where the costs of its activities were performed. In assembling its cost study, Comcast first determined costs incurred to provide services to only Tennessee customers. Second, Comcast excluded "indirect" expenses because Tennessee Rule 34 defines cost of performance as limited to only "direct" costs. Next the study divided the remaining direct costs into the corresponding five categories of items of income/earnings-producing activities (video, internet access, etc.). The final step in the study was to assign a state to each cost based upon where the cost was incurred, i.e., a cost was deemed incurred in the state where Comcast performed the activity giving rise to the cost.

Based upon the foregoing, the court ruled in favor of the Department, finding that Comcast had failed to correctly identify its earnings producing activity. The court explained,

> [The pertinent statutes] require this Court to first identify the earnings-producing activities, second, the Court must then determine where (in which state or states) the earning-producing activity was performed, and finally, if the activity was performed in more than one state, the Court must then determine which state had the largest share of that earnings-producing activity based on the cost of performance.

> Before progressing through the [three]-part test, it is useful to note that the controlling statute requires the Court to begin with "sales, other than sales of tangible personal property." Rule 34 further notes that the statute "provides for the inclusion in the numerator of the sales factor of gross receipts from transactions other than sales of tangible personal property (including transactions with the United States Government)." Tenn. Comp. R. & Regs. 1320-06-01-.34 (2008). Thus, the beginning point is one single number: total gross receipts from sales of other than tangible property. Neither the statutes nor Rule 34 contemplate beginning with subgroups of gross receipts or multiple categories of income.

> The first step in determining if the sales are "in this state" is to identify and determine the proper earnings-producing activities that generate the sales of services in Tennessee. In some of its papers Comcast argues that it has two separate "items of income" at issue (video services and internet services), and that its earnings-producing activities associated with its sales of those services are all of the "integrated, interdependent steps performed in Pennsylvania, Colorado, New Jersey, Tennessee, and other states." As such, Comcast seems to argue its "earnings-producing activities" are the nine activities performed to provide video services and the seven activities performed to provide HSD services. In other papers, Comcast argues that its five items of income are the "earnings-producing activities" and the multiple steps associated with the video and HSD categories are "integrated, interdependent steps" that are a sub-set of the broader earnings-producing activities.

> * * *

> Interpreting the relevant statutes and rule, this Court is compelled to draw several conclusions. First, "earnings-producing activities" is first and

foremost something that generates earnings or income. Second, it applies to "each separate item of income." Third, it is activity that is "directly engaged in by the taxpayer." Fourth, it is direct activity done in "the regular course of its trade or business." And fifth, it is direct activity done "for the ultimate purpose of gains or profit." With these considerations in mind, the Court turns to the "earnings-producing activities" identified by Comcast.

Comcast's argument begins to break down at the initial steps of identifying the correct "earnings-producing activities." First, the statutory framework does not provide for the division of sales or gross receipts into multiple items of income to be allocated individually. It is also readily apparent that Comcast's election to divide all of its "sales other than sales of tangible personal property" (sales of service) into five items of income separately apportioned significantly affects its Tennessee franchise and excise tax liability.

Accordingly, as Comcast has presented its proof, its "earnings producing activities" must be considered as having five broad activities (video activities, HSD activities, etc.), each with its own sub-set list of activities (nine video activities and seven HSD activities), which Comcast terms "steps." However, this is not the way "earnings-producing activities" should be identified and analyzed under Tennessee law as it existed in 2006 through 2008.

Comcast has not adequately explained why its earning's-producing activities should first be divided into five items of revenue and then each one run through the three-part test individually to determine if those activities should be allocated to Tennessee. The only explanation for the five income categories is that is how Comcast has organized its national billing practice (the five categories are so itemized in its bills). Moreover, to the extent Comcast argues the five income categories are its "earnings-producing activities," there is no link shown between those five categories and "each separate item of income" in Tennessee.

* * *

Comcast's approach to its identified "earnings-producing activities" does not begin with "each separate item of income" or sale of a service in Tennessee. Its five divisions of revenue, each with multiple subsets of activities it deems necessary to provide its various services, are all based on

its national business model. As such, its general approach to the required analysis is flawed from the beginning.

Furthermore, whether Comcast's stated nine activities for video services and seven for HSD services are "earnings-producing activities" themselves or separate steps comprising its earnings-producing activities, the "step" categories are flawed. Not only are they keyed to the activities of the national business rather than each separate item of income in Tennessee, but they also do not meet the very first characteristic of an "earnings producing activity," which is they must actually produce earnings.

The first activity Comcast lists for both video and HSD services is "develop products and technology." Comcast also states that Tennessee accounts for only 3% of its total revenue. A logical conclusion is that even if all Tennessee sales went away, Comcast's research and development activities would not change. Stated another way, Comcast's product and technology development activities do not relate to each separate item of income from Tennessee; they do not represent earning producing activities. Therefore they should not be considered an "earnings-producing activity" for the allocation analysis or even a necessary "step" for an earnings-producing activity. The Court recognizes that product development is a necessary part of a national business, but the analysis under Tenn. Code Ann. § 67-4-2012(i) and § 67-4-2111(i) (2008) does not look to activity that produces income for the national corporation, it looks to activity that produces each separate item of income in Tennessee.

Because Comcast has failed to carry its burden of showing it has correctly identified all the "earnings-producing activities" as required by Tennessee law, the Court is unable to move to the next steps, which are to determine the state in which the true earnings-producing activities occurred, and then determine in which state the greater of those activities occurred based on cost of performance. For this reason alone, the Court must hold that Comcast has failed to meet its burden of proving that the greater part of the costs for its video and HSD services occurred in a state other than Tennessee.

The court continued further and alternatively ruled that the activities underlying the licensing costs for video content took place in Tennessee, thereby establishing an alternative bases for dismissing Comcast's claim relating to its cable television receipts. The court entered judgment against Comcast in the amount of $3,668,257.14, which was an agreed-upon amount that included pre-judgment interest. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.    Whether the court erred in finding that the earnings producing activity occurred in more than one state.

B.    Whether the court erred in finding that Comcast failed to establish that a greater portion of the earnings producing activity was in another state.

C.    Whether the court erred in finding that a greater portion of Comcast's earnings producing activity associated with its video service was performed in Tennessee.

## III.    STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006). "The construction of statutes and of regulations promulgated pursuant to statutes and the application of those statutes and regulations to undisputed facts are questions of law." *Chumley*, 308 S.W.3d at 362 (quoting *Beare Co. v. Tennessee Dept. of Revenue*, 858 S.W.2d 906, 907 (Tenn. 1993)). As noted by our Supreme Court:

> The leading rule governing our construction of any statute is to ascertain and give effect to the legislature's intent. To that end, we start with an examination of the statute's language, presuming that the legislature intended that each word be given full effect. When the import of a statute is unambiguous, we discern legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning."

*Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 308 (Tenn. 2012) (citations omitted). In construing multiple statutes, our goal is to choose the most reasonable construction "which avoids statutory conflict and provides harmonious operation of the laws."

*Thurmond v. Mid-Cumberland Infectious Disease Consultants, PLC*, 433 S.W.3d 512, 517 (Tenn. 2014) (internal quotation marks omitted).

Ambiguities in statutes imposing taxes must be resolved in favor of the taxpayer. *Chumley*, 308 S.W.3d at 362 (citation omitted). However, "[w]hen a taxpayer challenges a tax assessment issued by the Department, the court must presume the assessment to be correct." *Wylie Steel Fabricators, Inc. v. Jackson*, 179 S.W.3d 509, 522 (Tenn. Ct. App. 2006) (citing *Stratton v. Jackson*, 707 S.W.2d 865, 867 (Tenn. 1986)). Further, our Supreme Court has placed the burden of proof "upon the taxpayer to prove that the assessment made is incorrect and to prove its right to recovery by clear and convincing evidence." *Edmondson Mgmt. Serv., Inc. v. Woods*, 603 S.W.2d 716, 717 (Tenn. 1980). "Vague allegations by the taxpayer to the effect that the Department's method of ascertaining the taxes due from him was incorrect are not sufficient to carry the taxpayer's burden. He must show by a preponderance of evidence that he not only has overpaid his taxes, but, also, the amount of such overpayment." *Id.* at 718.

## IV. DISCUSSION

### A. & B.

Our Supreme Court has explained:

Tennessee's corporate excise tax, Tenn. Code Ann. § 67-4-2001 et seq., and its franchise tax, Tenn. Code Ann. § 67-4-2101 et seq., are both privilege taxes, levied upon corporations for the privilege of doing business in this state. The excise tax is based on the taxpayer's net earnings, while the franchise tax is based on the taxpayer's net worth. Though the excise and franchise taxes are separate and distinct, this Court has recognized that the Legislature clearly intends that these taxes be taken in tandem and construed together as one scheme of taxation.

*Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016) (internal citations and quotations omitted). The parties agree that the Tennessee Excise Tax apportionment formula applicable in this case is as follows:

(a)(1) Except as otherwise provided in this part, for tax years beginning prior to July 1, 2016, all net earnings shall be apportioned to this state by multiplying the earnings by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts factor, and the denominator of the fraction shall be four (4).

* * *

> (h)(2)(i) Sales, other than sales of tangible personal property, are in this state, if the earnings-producing activity is performed:

> > (1)   In this state; or

> > (2)   Both in and outside this state and a greater proportion of the earnings-producing activity is performed in this state than in any other state, based on costs of performance.

Tenn. Code Ann. § 67-4-2012 (2008).[3]   They likewise agree that the Franchise Tax apportionment formula applicable is as follows:

> (a)(1) Except as otherwise provided in this part, for tax years beginning prior to July 1, 2016, the net worth of a taxpayer doing business both in and outside this state shall be apportioned to this state by multiplying such values by a fraction, the numerator of which shall be the property factor plus the payroll factor plus twice the receipts factor, and the denominator of the fraction shall be four (4).

* * *

> (h)(2)(i) Sales, other than sales of tangible personal property, are in this state, if the: (1) Earnings-producing activity is performed in this state; or (2) Earnings-producing activity is performed both in and outside this state and a greater proportion of the earnings-producing activity is performed in this state than in any other state based on costs of performance.

Tenn. Code Ann. § 67-4-2111 (2008).

The Parties agree on the amount at issue, depending upon where the earnings producing activity was performed as found by the trial court and now this court. The Department argued below and argues again on appeal that the earnings producing activity at issue occurred solely in this state. The Department explains that the earnings producing activity was the delivery of cable services to subscribers' homes in Tennessee, thereby establishing that the activity was performed exclusively in Tennessee and obviating any need for a cost comparison. We, like the trial court, disagree. The record is replete with information establishing that the distribution of cable services is dependent

---

[3] The statutes cited are those in effect during the tax years at issue. These statutes have since been amended but do not apply to the pre-2015 assessments at issue here.

- 14 -

upon a series of "integrated, interdependent steps" necessary to deliver said services. The video content alone reached Comcast's customers only after traveling through the "national fiber "backbone" to several divisions within the national network." The regional area network that serviced Tennessee during the time at issue was located in Georgia, not Tennessee, and was jointly operated by teams in Georgia, Colorado, and New Jersey. Under these circumstances, we decline to hold that the activity at issue was performed *solely* in Tennessee. We affirm the trial court on this issue.

Accordingly, Comcast was tasked with proving its right to recovery by identifying the earnings producing activity at issue and establishing that a greater portion of the activity occurred in a state other than Tennessee. Comcast argues on appeal that the court incorrectly rejected its method of calculation and erroneously held that the statute requires all receipts to be analyzed and sourced collectively in one single category instead of in the five categories as identified here.

To aid in our determination of this issue, we turn to what is now commonly referred to as Rule 34, found at Tenn. Comp. R. & Regs. 1320-06-01-.34. Rule 34 provides, as applicable in this case and during the years at issue, as follows:

> (2) Earnings Producing Activity; Defined. The term "earnings producing activity" applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer *in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit*. Such activity does not include transactions and activities performed on behalf of a taxpayer, such as those conducted on its behalf by an independent contractor. Accordingly, the earnings producing activity includes but is not limited to the following:
>
> > (a) The rendering of personal services by employees or the utilization of tangible and intangible property by the taxpayer in performing a service.
> > (b) The sale, rental, leasing, or licensing or other use of real property.
> > (c) The rental, leasing, licensing or other use of tangible personal property.
> > (d) The sale licensing or other use of intangible personal property.
>
> (3) Costs of Performance; Defined. The term "costs of performance" means direct costs determined in a manner consistent with generally

accepted accounting principles and in accordance with accepted conditions or practices in the trade or business of the taxpayer.

(4)     Application.

(a)     In General. Receipts (other than from sales of tangible personal property) in respect *to a particular* earnings producing activity are in this state if:

1.     The earnings producing activity is performed wholly within this state.

2.     The earnings producing activity is performed both in and outside this state and a greater proportion of the earnings producing activity is performed in this state than in any other state, based on costs of performance.

(b)     Special Rules.     The following are special rules for determining when receipts from the earnings producing activities described below are in this state:

\* \* \*

3.     Gross receipts for performance of personal services are attributable to this state to the extent such services are performed in this state.   If services relating to a single item of income are performed partly within and partly without this state, the gross receipts for the performance of such services shall be attributable to this state only if a greater portion of the services were performed in this state, based on costs of performance.  Usually where services are performed partly within and partly without this state, the services performed in each state will constitute a separate earnings producing activity; in such case the gross receipts for the performance of services attributable to this state shall be measured by the ratio which the time spent in performing such services in this state bears to the total time spent in performing such services everywhere. Time spent in performing services includes the amount of time expended in the performance of a contract or other obligation which gives rise to such gross receipts.   Personal service not directly connected with the performance of the contract, or other obligation, as for example, time expended in negotiating the contract, is excluded from the computation.

(Emphasis added.).   Our interpretation of Rule 34 supports Comcast's assertion that it was free to identify different categories of earnings producing activity and then analyze each separately.

However, we, like the trial court, hold that Comcast selected its categories in an attempt to circumvent its tax liability. The Department argues that Comcast's earnings producing activity should have been identified as its cable segment as a whole, which sells video, internet, and telephone service. The Department explains that these three services "are delivered over the same cable to the subscriber's premises, are marketed together, with bundling encouraged, and are billed together." Instead, Comcast identified five separate categories, two of which included a plethora of integrated, interdependent steps requiring further analysis. We refrain from suggesting an ideal list of categories; however, we find Comcast's use of five categories, including an "other" category that included video-related revenue. We also agree with the trial court that the additional subcategories, identified as integrated, interdependent steps for video and HSD services, included items that are neither earnings producing activities nor necessary steps for the production of revenue in Tennessee. With all of these considerations in mind, we agree with the trial court that Comcast failed to fulfill its burden of proving its right to recovery and that the tax assessment must be presumed correct. We affirm the court on this issue.

C.

The court issued an alternative ruling in which it held that a greater portion of Comcast's earnings producing activity associated with its video service was performed in Tennessee.[4] This issue is pretermitted by our agreement with the trial court that Comcast failed to prove its right to recovery.

## V. CONCLUSION

This judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellants, Comcast Holdings Corporation, Comcast of the South, Inc., and Comcast of Arkansas/Florida/Louisiana/Minnesota/Mississippi/Tennessee, Inc.

_____<br>JOHN W. McCLARTY, JUDGE

---

[4] The court did not issue any similar findings with respect to Comcast's HSD activities. Comcast asks this court to vacate the judgment and enter a new judgment accounting for the removal of internet receipts if we find that Comcast correctly identified its earnings producing activities. Having ruled otherwise, we refrain from further discussion on this issue.